UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RECEIPT # 45406
AMOUNT $ 150-
SUMMONS ISSUED 2
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 3-4-03

MICHAEL SEGRETO, Individually and on Behalf of all Others Similarly Situated,

Plaintiff,

vs.

CREDIT SUISSE FIRST BOSTON CORPORATION, and TIM MAHON

Defendants.

C.A. No. 03 -

JURY TRIAL DEMANDED

**03 CV 10394 MLW**

**CLASS ACTION COMPLAINT**   MAGISTRATE JUDGE Bowler

Plaintiff, through plaintiff's attorneys, alleges the following upon information and belief, except as to the allegations which pertain to the plaintiff and plaintiff's counsel, which are alleged upon personal knowledge. Plaintiff's information and belief are based, *inter alia*, on the investigation made by and through Plaintiff's attorneys.

## NATURE OF ACTION

1. This is a federal securities class action which is brought by the plaintiff against defendants Credit Suisse First Boston Corporation ("CSFB") and Tim Mahon ("Mahon"), on behalf of all person or entities who purchased the common stock of Atmel Corporation ("Atmel") during the period from July 22, 1999 through August 6, 2001 (the "Class Period"). Plaintiff seeks to recover damages caused to the Class by Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

2. This action arises as a result of the issuance by the defendants of positive analyst reports recommending that investors purchase Atmel stock. When issuing those reports, defendants failed to disclose significant, material conflicts of interest

which they had, with respect to links between such positive recommendations and CSFB's interest in obtaining investment banking business from Atmel.

3. As a result of Defendants' misconduct, alleged herein, Plaintiff and the Class Members have suffered substantial damages.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. §§ 1331 and 1337.

5. This action arises under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C.§ 78j(b)], Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5] and Section 20(a) of the Exchange Act [15 U.S.C.S. § 78t(a)].

6. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts complained of herein occurred in substantial part in this District.

7. In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications and the facilities of the New York Stock Exchange, a national securities exchange.

## PARTIES

8. Plaintiff purchased shares of Atmel stock during the Class Period, as set forth in the attached certification, and was damaged thereby.

9. Defendant CSFB is a leading global investment-banking firm with headquarters in Zurich, London and New York, and which has offices located in Boston,

2

Massachusetts and numerous other cities. CSFB is a wholly owned subsidiary of Credit Suisse Group which is headquartered in Zurich, Switzerland.

10. Defendant Tim Mahon ("Mahon") was a research analyst in the Technology Group at CSFB during the Class Period.

11. Defendant Mahon is sometimes referred to herein as the "Individual Defendant."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

12. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons or entities who purchased shares of Atmel during the Class Period and who were damaged thereby. Excluded from the Class are defendants; the Individual Defendant's immediate family; any director, officer, parent, subsidiary, or affiliate of CSFB; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors and assigns.

13. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, shares of the common stock of Atmel were actively traded in an efficient market on the NASDAQ National Market System. Record owners and other members of the Class may be identified from records maintained by Atmel and/or its transfer agents and may be notified of the pendency of this action by mail and

publication, using forms of notice similar to those customarily used in securities class actions.

14.     Plaintiff's claims are typical of the claims of other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

15.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

16.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)     Whether defendants participated in and pursued the illegal course of conduct complained of herein;

(c)     Whether statements disseminated to the investing public during the Class Period made misrepresentations or omissions of material information as alleged herein;

(d)     Whether the market price of the common stock of Atmel was artificially inflated due to the material misrepresentations and omissions complained of herein;

(e)     To what extent the members of the Class have sustained damages and the proper measure of damages.

17.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigations make it impossible for members of the Class individually to seek redress for the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

18.     Defendant CSFB claims to be a leading global financial services company which serves global institutional, corporate, government and individual clients.  Its businesses include securities underwriting, sales and trading, financial advisory services, investment research, venture capital and brokerage services for financial institutions.

19.     Atmel is a corporation based in San Jose, California that designs, develops, manufactures and sells a wide range of integrated circuit products.

### CSFB's Scheme to Defraud

20.     As part of an ongoing multi-state investigation, Massachusetts state securities regulators have been investigating whether analysts' reports at CSFB had been tainted by the firm's desire to win investment banking business.  On September 12, 2002, Reuters News Service reported that the investigation by Massachusetts securities regulators had uncovered e-mails showing that CSFB analysts felt pressured to recommend stocks to please potential investment-banking clients, and that there

were links between analysts issuing positive recommendations and their receiving compensation from CSFB's investment banking division. The Reuters article states:

> An exchange of CSFB e-mails indicates that CSFB analysts may routinely have received compensation that was linked to specific investment banking transactions. The e-mail exchange, which was provided by sources close to securities regulators, also suggests that a CSFB analyst may have publicly recommended a company whose prospects he privately doubted.
>
> Indeed, the e-mails contain language – such as a reference to a stock as a "piece of crap" – that is reminiscent of the now-famous Merrill e-mails unveiled in April by New York State Attorney General Elliot Spitzer.

21. In the September 12 article, Reuters reported that in the CSFB e-mails, Elliot Rogers, who held a supervisory position in CSFB's research department, asked an analyst, Kevin McCarthy, whether he had been "paid for helping it out" on the August 2000 initial public offering by Lantronix, Inc. ("Lantronix"), a networking technology supplier The Lantronix IPO was managed by Donaldson, Lufkin & Jenrette ("DLJ"), which CSFB had acquired in the fall of 2000. According to Reuters, Rogers stated in the e-mails that if McCarthy was paid, he might "have a moral obligation to maintain some form of backburner coverage." Rogers went on to state that if McCarthy's investment banking division compensation "did not reflect this puppy, I will support you in pushing back on coverage." McCarthy replied in an e-mail that he "agreed to do the deal" because DLJ had no networking analyst and that he "would do stuff beyond the call of duty." McCarthy went on to state "**I put my reputation on the line to sell this piece of crap** calling favors from very important clients. . . . This deal was an embarrassment to me and the firm and I wasted a lot of bullets to get it done." (Emphasis added).

22. In the September 12 article, Massachusetts Secretary of the Commonwealth William Galvin, the top securities regulator for the state, said that his investigation had uncovered "very troubling" material:

6

> "They suggest to us a pattern of breach of fiduciary duty," Galvin said. "It appears at least in some cases that (analysts) treated investors like suckers, and apparently the motive was simply more profit for the company with a reckless disregard for the rights of investors."

23. On September 19, 2002, a financial columnist for The Boston Globe reported on what was referred to within CSFB as the "Agilent Two-Step". The Boston Globe column disclosed that in an e-mail message sent on October 11, 2000, a CSFB analyst sought advice from Rogers about new coverage for two companies based in Asia. According to the column, the analyst expressed reservations about the business prospects of these companies, but he noted in the e-mail that the companies were "clearly the largest revenue accounts for us in Asia". The analyst stated that he was "debating" whether his first analyst note on these companies could have a neutral rating. The e-mail stated "Wondering how to approach this based on <u>banking sensitivities</u>". (Emphasis added.)

24. The following day, defendant Tim Mahon, who had received a copy of the October 11 e-mail message, responded with the advice:

> Suggest you ask Elliot [Rogers] about the 'Agilent Two-Step.' That's where in writing you have a buy rating (like we do on Chartered Semiconductor, and thank God it's not a Strong Buy) but verbally everyone knows your position.

25. On September 19, 2002, USA Today reported that e-mails uncovered by Massachusetts investigators suggested that recommendations of other companies' stocks by other CSFB research analysts, were similarly tainted by CSFB's desire to attract investment banking customers. The USA Today article stated in relevant part:

> Internet analysts at Credit Suisse First Boston called it the "Agilent Two-Step" – that's when they would rate a stock a "buy" while secretly telling large investors their true opinion, according to e-mails uncovered by Massachusetts securities regulators.
>
> The e-mails, regulators say, are just the latest sign that stock research at CSFB was tainted by its need to attract investment-banking business.

7

> "The discoveries keep coming, and they keep getting more and more amazing," says William Galvin, Secretary of State for Massachusetts and the chief securities regulator.
>
> Investigators in Massachusetts appear to be finding many of the same practices that New York authorities found at Merrill Lynch, which in May agreed to pay $100 million to settle charges that its analysts recommended stocks they didn't really believe in. Massachusetts investigators have found CSFB e-mails that describe how:
>
> - Analysts felt pressure to positively rate investment-banking clients.
>
> - The firm gave executives who hired CSFB for investment banking access to initial public offering.
>
> - Frank Quattrone, CSFB's star Internet investment banker, tried to keep control of the stock research team.

26. On September 20, 2002, the New York Post reported that Secretary Galvin had, in a letter from Galvin's office, asked New York State Attorney General Elliot Spitzer to consider filing criminal charges against CSFB over the firm's fraudulent research coverage. The New York Post article reported that the letter, written by Deputy Secretary Matthew Nestor, stated that "This office now has a good faith basis to believe that certain actions might include the violation of criminal statutes . . . ." The article stated that the damaging evidence was found in more than 80,000 CSFB e-mails reviewed as part of Secretary Galvin's investigation of analysts' conflicts of interest at CSFB.

27. According to an article in The Boston Globe on October 7, 2002, a CSFB proposal for potential clients, dated July 19, 1999, represented that the company "stands by its clients" by offering better stock ratings for investment banking clients than do rival investment banking companies.

28. The October 7, 2002 Boston Globe article also disclosed that, in a series of e-mails sent in March 2001, CSFB employees explicitly linked favorable analyst coverage with investment banking fees. In one of these e-mails, a CSFB employee

suggested that CSFB "return [a company] to 'most favored nation' status" because a $1.8 million fee had been paid, as requested. This e-mail further stated that "I have represented to [the company] that you will be resuming full coverage].

29. Secretary Galvin called these documents a "smoking gun" that shows clients of CSFB had to buy investment banking services in order to receive stock coverage. According to Secretary Galvin

> These documents have [CSFB] boasting that they would not give bad ratings, even if others did. . . . In addition, [CSFB] withheld analysis for a period of time. When they were suddenly able to get more business, they resumed coverage.

30. In a Reuters report on October 9, 2002, Secretary Galvin was quoted that: "We continue to uncover more damaging material that raises more questions, such as the materials discussed yesterday."

31. On October 21, 2002, the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth filed an administrative complaint against CSFB for violating Massachusetts General Laws Chapter 110A, the Massachusetts Uniform Securities Act, and regulations issued pursuant thereto. This complaint (the "Massachusetts Complaint") alleged that research analysts in the CSFB Global Technology Group

> worked for and were controlled by investment banking personnel of CSFB. This reporting structure and complete control resulted in Investment Banking exerting undue influence on the research analyst to give favorable ratings to companies for which CSFB had done or hoped to do investment banking work. Analysts disseminated biased, subjective, and compromise research favorable to CSFB investment banking clients . . . . CSFB **purposely misled investors** by disseminating into the marketplace fraudulent material misstatements of fact concerning the companies covered by the analysts. Moreover, CSFB failed to disclose any of the analysts' conflicts of interest to investors.

(Emphasis added)

32. In a section of the Massachusetts Complaint entitled "Additional Examples of Fraudulent Research", there was a section on AOL.

33. As alleged in the Massachusetts Complaint,

> Yet another disturbing example showing that analysts felt pressured not to downgrade a stock and to sugarcoat their reports and other public information can be found in an e-mail concerning AOL. In this exchange, Laura Martin from the Entertainment Equity Research, explains to Jamie Kiggen the analyst covering AOL, how to hide negative information from the public. At the time, Kiggen was considering reducing AOL numbers before AOL released its quarterly report. Martin tells Kiggen rather than "pissing off the company," she "would NOT lower numbers on AOL even though they can't make them." She explains that, "[w]e get paid to add value." Kiggen followed this deceptive advice, and in the next *Monthly Review and Comment* published by CSFB in May 2001, Kiggen wrote that AOL would deliver on AOL's 2001 forecast. Kiggen did not lower his estimates on AOL until August of that year. Thus, **average investors** who purchased AOL in and around this time based on Kiggen's deception, **were intentionally misled** about his actual belief that the company would not make its forecasted numbers.

(Emphasis added)

34. In an e-mail message sent on March 15, 2001, an analyst in the CSFB Technology Group wrote that "JK [presumably Jamie Kiggen] is in Europe but wants to talk next week about reducing our own numbers [on AOL] at some point before they report Q1."

35. A response sent by e-mail on March 29, 2001 stated: "I would NOT lower numbers on AOL, even though they can't make them." This e-mail referred to the possibility of "pissing off the company", questioned whether "to incur the company's wrath and lower the EBITDA estimate" and observed that "We get paid to add value."

36. Analyst Kiggen authored a research report on AOL on April 3, 2001. Directly contrary to the views expressed in the internal e-mails cited above, the report stated:

> Regarding ongoing investor concerns as to whether AOL Time Warner can meet its guidance . . . our view continues to be that this guidance is achievable . . . .

37. In a report authored by Kiggen on April 16, 2001, CSFB reiterated its view that AOL's revenue and earnings guidance was "achievable".

38. The Conclusion section of the Massachusetts Complaint stated as follows:

> A sophisticated review of the Tech Group's dealings show that CSFB touted "independent research" and instead used its research to market its investment banking business. CSFB also rewarded employees and company management with investment opportunities. This was hidden from the public, who relied on the research information. Thus, CSFB **perpetrated fraud by the disseminated material misstatements of facts into the marketplace**.

(Emphasis added)

39. The head of the CSFB Technology Group, Frank Quattrone, expressly linked analyst coverage to investment banking business in an e-mail on November 6, 2000 to an analyst in the group. As disclosed in The Boston Globe on November 27, 2002, Quattrone asked the analyst in his e-mail:

> What have we extracted from [the company being covered] on banking side to get this coverage?

40. As noted in paragraph 31 above, the Massachusetts Complaint alleges that analysts in the Technology Group were controlled by investment banking personnel. According to an article in *Fortune* magazine on September 3, 2001, Quattrone was not shy about using his control. According to a former managing director of Deutsche Morgan Grenfell, a large investment banking firm where Quattrone previously worked, Quattrone told an analyst who wanted to issue a less than flattering report about a client that

> I'll have you out of here Monday morning if you say that. Do you want to work in this firm? Do you want to be a team player? When it comes time for bonus review, all this will be remembered.

## CSFB's Scheme Included Coverage of Atmel

41. The Technology Group at CSFB initiated coverage of Atmel on July 22, 1999, when it issued a report authored by defendant Mahon, an analyst in the group.

42. Consistent with the practice of the Technology Group to use coverage to curry favor with technology companies, CSFB rated Atmel a BUY and set price targets aggressively above the then current market price for Atmel shares.

43. In the July 22, 1999 report, Atmel was rated a BUY with a price target of $38 per share. Atmel shares had closed at $28 on July 21, 1999.

44. Between July 22, 1999 and July 20, 2001, CSFB issued a number of reports on Atmel, all of which were authored by defendant Mahon, and all of which rated Atmel a BUY.

45. For example, on November 16, 1999, a CSFB report on Atmel authored by defendant Mahon was entitled "Just When You Thought It Couldn't Get Any Better!" CSFB raised its price target for Atmel from $46 per share to $65 per share. Atmel shares had closed at $46.06 on November 15, 1999. The price of Atmel stock surged on November 16, opening at $47.94 per share, and closing at $48.75 per share.

46. On February 4, 2000, Atmel had a secondary public offering in which it sold 18 million shares at $35.50 per share, for gross proceeds of $639 million. CSFB was co-manager for the offering.

47. On February 8, 2000, only days after the secondary offering, CSFB issued a report on Atmel in which it recommended Atmel as a BUY and raised its price target from $32.50 per share to $50 per share. (There had been a two for one split on December 20, 1999, so that the target price was $100 in pre-split prices, up from a pre-split target of $65.) This report was also authored by defendant Mahon.

48. On April 20, 2000, CSFB issued a report on Atmel which rated Atmel a BUY and again raised the target price, this time to $64 per share (or a pre-split price of $128 per share).

49. CSFB maintained its BUY rating and target price through its report issued October 20, 2000, authored by defendant Mahon. (The target price on the October 20, 2000 report was $32 per share, which reflected another two for one split on August 28, 2000.) CSFB maintained this target price and BUY rating in the October 20, 2000 report, notwithstanding that its estimate for Atmel's earnings per share (EPS) for 2000 was $0.55, as compared to an estimate of $0.95 EPS for 2000 in CSFB's April 20, 2000 report. Atmel's shares were trading at $14.42 as of the time of the October 20, 2000 report. Thus, the target price of $32 represented a projected appreciation of 221%.

50. On April 12, 2001, CSFB issued a report on Atmel, authored by defendant Mahon, which continued to rate Atmel a BUY and set a price target of $18 per share, or approximately 80% above the then current price of $10.11 per share. CSFB maintained a BUY rating and a projected price appreciation of 80%, notwithstanding that it had lowered its EPS estimate for Atmel's March 2001 quarter by one-third, or from $0.18 to $0.12. CSFB slashed its EPS estimate for the year 2001 by 50%, or from $0.80 to $0.40. In contrast with the BUY rating and aggressive price target, buried in the text of the report was the statement: "we continue to believe that investors should remain on the sidelines until signs of a bottoming in fundamentals begin to surface."

51. CSFB maintained its BUY rating and price target of $18 per share in a report authored by defendant Mahon that was issued on June 19, 2001, notwithstanding a reduction in its estimate for 2001 EPS from $0.40 to $0.30, or 25%. Apparently to avoid alienating Atmel, CSFB maintained a BUY rating and a price target reflecting an 80% appreciation, notwithstanding that CSFB stated in the body of the report that it believed the stock was fully valued and there was downside risk to CSFB's estimates. As stated in the report:

> We maintain our BUY ratings but continue to believe that the stock remains fully valued . . . . we also believe there continues to be downside risk to our estimates. . . .

52. Defendant Mahon's April 12 and June 19, 2001 reports, in which he maintained a BUY rating and a price target well above the current market price, while disclosing a more negative evaluation in the text of the reports, is consistent with, and reflects, CSFB's practice of allowing investment banking interests to influence analyst reports.

53. According to internal CSFB e-mails, as reported in The Boston Globe on November 27, 2002, the analyst Jamie Kiggen wanted to lower his rating on the internet company Yahoo Inc. to SELL, but before doing so asked the investment bankers for "your input" in an e-mail on March 7, 2001. Bill Brady, a top aide to Quattrone, replied that he "would appreciate it if you could keep it at a hold, while still highlighting all of the negatives" in the written report.

54. The BUY rating in the April 12, 2001 report, notwithstanding the statement in the text that CSFB continued "to believe that investors should remain on the sidelines", appears to have reflected investment banking influence on the report. Similarly, the BUY rating and price target of $18 per share in the June 19, 2001 report, in contrast to the comment in the body of the report that we "believe that this stock remains fully valued", appears to reflect investment banking influence on the report.

55. It was not until a report issued on August 7, 2001, authored by defendant Mahon, that CSFB downgraded Atmel from a BUY to a HOLD. The downgrade was made notwithstanding that CSFB maintained its target price of $18 per share.

## COUNT I

### AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

56. Plaintiff repeats and realleges each and every allegation set forth above.

57. During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially

inflate and maintain the market price of the common stock of technology companies that were covered by CSFB's stock research team; and (iii) cause plaintiff and other members of the Class to purchase those companies' stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set forth herein.

58.     These defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of Atmel common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

59.     Defendants' acts were done knowingly or recklessly and for the purpose and effect of obtaining lucrative investment banking business from Atmel. Defendants recommended that investors buy Atmel stock without disclosing a serious conflict of interest between defendants' reports and CSFB's desire to obtain investment-banking business from Atmel, and they failed to disclose that such positive recommendations were linked to CSFB's desire to obtain and/or keep Atmel as an investment-banking customer.

60.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the common stock of Atmel was artificially inflated during the Class Period. In ignorance of the fact that the market price of Atmel shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the

other members of the Class acquired Atmel common stock during the Class Period at artificially inflated prices and were damaged thereby.

61. At the time of said misrepresentations and omissions, plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class known of the omitted material facts, plaintiff and the other members of the Class would not have purchased or otherwise acquired Atmel common stock during the Class Period, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62. Plaintiff and the members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of defendants' misrepresentations, omissions and other fraudulent conduct alleged herein. Absent defendants' wrongful conduct, plaintiff and the members of the Class would not have been injured.

63. By virtue of the foregoing, defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64. As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the common stock of Atmel during the Class Period.

## COUNT II

### AGAINST DEFENDANT CREDIT SUISSE FIRST BOSTON PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT

65. Plaintiff repeats and realleges each and every allegation set forth above.

66. This claim is asserted against defendant CSFB pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

67. During the entire Class Period, defendant CSFB was a "controlling person" of the Individual Defendant, within the meaning of Section 20(a) of the Exchange Act.

68. Defendant CSFB was a "controlling person" of the Individual Defendant because it had the influence and power over the Individual Defendant to cause, and it did cause, the Individual Defendant to engage in the wrongful conduct complained of herein, and because it had the power to have prevented the Individual Defendant from engaging in the unlawful conduct alleged herein, but it purposely and intentionally did not use that power to do so.

69. As set forth above in Count I, defendant Mahon by his acts and omissions, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of its status as a "controlling person" of the Individual Defendant, CSFB is liable, to the same extent as is the Individual Defendant, for the Individual Defendant's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, pursuant to Section 20(a) of the Exchange Act.

## **PRAYERS FOR RELIEF**

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A. declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B. finding that the defendants violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint;

C. awarding plaintiff and the members of the Class damages, together with interest thereon;

D.  awarding plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

E.  awarding plaintiff and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: March 4, 2003

By his attorneys,

*/s/ Thomas G. Shapiro*

Thomas G. Shapiro, BBO #454680
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109
(617) 439-3939

## PLAINTIFF'S CERTIFICATION OF
## SECURITIES FRAUD CLASS ACTION COMPLAINT

I, Michael ~~Segrito~~ Segreto (MJS), hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1. I have reviewed the Complaint against Credit Suisse First Boston and Tim Mahon and I authorize it to be filed.

2. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

3. My transactions in Atmel (ATML) securities during the Class Period were as follows:

| Date | Transaction | # of Shares | Price Per Share |
|---|---|---|---|
| 02/07/01 | Purchase | 1000 | $15.25 |
| 06/20/01 | Sold | 1000 | $10.70 |

4. I did not purchase these securities at the direction of counsel, or in order to participate in any private action arising under the Securities Act of 1933 or the Securities Exchange Act of 1934.

5. I have neither served, nor sought to serve, as a representative party on behalf of a class in a securities fraud lawsuit during the three-year period preceding the date of signing this certification, except as follows:

6.	I will not accept any payment for serving as a representative on behalf of the Class beyond my <u>pro rata</u> share of any possible recovery, except for an award, as ordered or approved by the Court, for reasonable costs and expenses (including lost wages) directly relating to the representation of the Class.

Signed under the penalties of perjury this 28 day of Feb., 2003.

Michael ~~Segrito~~ Segreto (MSS)